## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| WHITE MARLIN OPEN, INC., et al., | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | Civil Action No.: RDB-16-3105 |
| | * | |
| PHILLIP G. HEASLEY, | | |
| | * | |
| Defendant. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

Over the past forty years, the White Marlin Open ("WMO") in Ocean City, Maryland has become the largest billfish fishing tournament in the world. As in other big money fishing tournaments, WMO may require anglers winning top prizes to undergo polygraph examinations. In the 2016 WMO Tournament, Rule G.7 of the Tournament Rules specified that "all anglers winning $50,000.00 or more" and "any crew member registered to" a winning boat may be required to take and pass a polygraph test. (J.E. 25.) At the conclusion of the 2016 tournament, WMO required four top prize-winning anglers to report for polygraph examinations to ensure compliance with the Tournament Rules—that is, with the legal contract governing the anglers' participation in the tournament. Defendant Philip G. Heasley, on board the vessel *Kallianassa*, caught the Tournament's only qualifying white marlin and was eligible to win $2,818.662.00. (Am. Compl., ECF No. 87 at ¶¶ 4-5.) Plaintiff Richard Kosztyu, on board the *Hubris*, caught a 236.5 pound big eye tuna and was eligible to collect $767,091.00. (*Id.* at ¶ 7.) Plaintiff Jim Conway, on board the *Get Reel*, caught the

only qualifying blue marlin and was eligible to win $258,995.00.  (*Id.* at ¶ 6.)  Plaintiff Mark Hutchison, on board the vessel *Magic Moment*, caught a 233 pound big eye tuna and was eligible to collect $131,968.00.  (*Id.* at ¶ 8.)  Kosztyu, Conway, and Hutchison passed their polygraph tests.  Heasley did not.  WMO then accorded Heasley and his crew the opportunity to take additional polygraph examinations to qualify for the $2.8 million prize.  All of their subsequent polygraph tests indicated deception.

The failure of Philip Heasley and the crew of the *Kallianassa* to pass polygraph examinations led to this Court.  It led Heasley to raise legal challenges to his contract as a participant in the 2016 WMO Tournament.  It led to his asserting challenges to the administration of the polygraphs, their accuracy, and the efficacy of polygraphy itself.  It led to nine months of litigation and eight days of testimony.

Ultimately, this Court concludes that Mr. Heasley's arguments are without merit.  The White Marlin Open complied with its obligations and did not breach the Tournament Rules contract as a matter of law.  Consequently, Mr. Heasley's performance under that contract was not excused.  By failing to satisfy the Tournament Rules' polygraph requirement, Heasley himself failed to perform under the contract and is not entitled to the Prize Money.

Apart from this legal ruling, this Court finds as a matter of fact that Mr. Heasley and the crew of the *Kallianassa* violated an important Tournament rule which disqualifies their catch of the 76.5 pound white marlin.  (J.E. 25 at C.6.)  Specifically, it is clear from the evidence and testimony presented in this case that the *Kallianassa*'s fishing lines were deployed and in the water before 8:30 a.m. on Tuesday, August 9, 2016.

Mr. Heasley's boat, the *Kallianassa*, meaning "beautiful queen," apparently takes her name from that of the ancient Greek sea-nymph who appears in Book XVIII of Homer's *Iliad*.[1]  The classical concept of hubris has come to refer to a dangerous over-confidence or pride.[2]  It is thus ironic that anglers from the boats named *Hubris*, *Get Reel*, and *Magic Moment* stand to benefit from the *Kallianassa*'s disqualification in this case.  Here, the *hubris* and over-eagerness of the *Kallianassa*'s crew resulted in their *getting reels* deployed before the 8:30 a.m. *magic moment* on Tuesday, August 9, 2016.

Accordingly, for the reasons that follow, this Court concludes that:

1. Plaintiff White Marlin Open, Inc. complied with its obligations under the 2016 White Marlin Open Tournament Rules and did not breach that contract;

2. Defendant Philip G. Heasley's performance under the Tournament Rules contract was not excused;

3. Heasley failed to satisfy the Tournament Rules' polygraph requirement and, therefore, failed to perform under that contract;

4. Heasley is not entitled to the $2,818,662.00 in Prize Money as a matter of law;

5. Even if plaintiff White Marlin Open, Inc. had breached its obligations under the 2016 Tournament Rules, Heasley would not be entitled to the prize money because the evidence presented at trial shows that Heasley and the crew of the *Kallianassa* violated the Tournament Rules by deploying fishing lines before 8:30 a.m. on Tuesday, August 9, 2016, the date they caught the 76.5 pound white marlin.

Pursuant to Federal Rule of Civil Procedure 52(a), the following memorandum constitutes this Court's findings of fact and conclusions of law.

---

[1] Homer, *Iliad* XVIII:45 (Barry Powell Tr., Oxford Univ. Press 2014).  *See also id.* at 426, n. 47 (definition).

[2] Simon Hornblower and Antony Spawforth, "Hubris," *The Oxford Classical Dictionary* 712 (4th ed., Oxford Univ. Press 2012).  Interestingly, hubris was recognized as a legal cause of action in ancient Athens.  *Id.*

# BACKGROUND

On August 26, 2016, plaintiff White Marlin Open, Inc. filed this interpleader action pursuant to Maryland Rule 2-221 in the Circuit Court of Maryland for Worcester County, requesting a judicial determination of the rights and liabilities of the parties.  (ECF No. 2.) On September 8, 2016, defendant Heasley, a Florida citizen and the only citizen of that state named in WMO's Interpleader Complaint, removed the case to this Court on the basis of diversity of citizenship jurisdiction, 28 U.S.C. § 1332, and 28 U.S.C. § 1441.  (ECF No. 1.) Following Heasley's Removal of the case to this Court, plaintiff (then defendant) Mark Hutchison moved to remand this case to Maryland state court.  (ECF No. 21.)  Heasley opposed Hutchison's Motion and cross-moved to realign the parties based on their respective interests.  (ECF No. 24.)  The Court conducted a hearing on these and several related motions on November 18, 2016.  (Nov. 18, 2016 Hr'g Tr., ECF No. 52.)  As set forth on the record and in the Order that followed, this Court realigned the parties, designating Heasley as the sole defendant and WMO and all the other named anglers as plaintiffs, and concluded that jurisdiction was proper pursuant to 28 U.S.C. § 1332.  (ECF No. 44.)  *See United States Fidelity & Guar. Co. v. A & S Mfg. Co.*, 48 F.3d 131, 133 (4th Cir. 1995) (setting for standard for realignment of parties); *Hidey v. Waste Sys. Int'l, Inc.*, 59 F. Supp. 2d 543, 545 (D. Md. 1999) (same).  In reaching its decision regarding realignment, this Court noted in particular the adverse interests of Heasley vis-à-vis the other anglers and WMO, and Heasley's right as an out-of-state party to litigate this case in a federal forum. This Court also noted the importance of precluding parallel litigation in state and federal

courts.[3]  (ECF No. 52 at 64:14-65:3.)  This Court also ordered WMO to deposit the $2,818,662.00 in Tournament Prize Money (the "Prize Money") in the Court's Registry, and WMO did so on November 23, 2016.[4]  *See* ECF No. 45.

As this case proceeded, the parties filed a series of crossclaims and counterclaims. On December 19, 2016, plaintiffs Kosztyu and Hutchison filed a Crossclaim against WMO alleging breach of contract based on WMO's alleged failure to comply with its own Tournament Rules.  (ECF No. 53.)  WMO filed a timely Answer to the Crossclaim and asserted a series of affirmative defenses.  (ECF No. 58.)

On December 22, 2016, plaintiffs Kosztyu and Hutchison filed a Crossclaim against all other parties seeking declaratory relief (ECF No. 54) and a Complaint against Heasley, also seeking declaratory relief (ECF No. 55).  Plaintiffs Jim Conway and WMO filed separate answers to the Crossclaim (ECF Nos. 59, 65), and defendant Heasley moved to dismiss both the Crossclaim and WMO as a party to this case (ECF No. 56).

---

[3] For ease of reference, the relevant portion of the Hearing Transcript is included herein:

> The Court:
> "*In toto*, realigning all the other anglers other than Mr. Heasley as plaintiffs serves several important functions, in this Court's view.  First, it brings together all the parties who have an interest in finding Heasley ineligible, and preserves the original alignment of the two central parties to this dispute, which are White Marlin Open and Mr. Heasley.
> It furthermore preserves the right of access to federal court.
> In addition, it precludes the prospect of parallel litigation being filed in state and federal court, something we really haven't particularly addressed in any detail, but in terms of the potentiality of a complaint filed by Mr. Heasley directly against White Marlin, on basis of diversity of citizenship here in federal court.  And we'd have the difficulty of potential parallel litigation."

(Nov. 18, 2016 Hr'g Tr., ECF No. 52 at 64:14—65:3.)

[4] This Court notes that while WMO named thirteen anglers as interested parties in this case, only four have filed Answers (Kosztyu, Hutchison, Conway, and Stuart), and only three have participated actively in this litigation (Kosztyu, Hutchison, and Conway).  The 'inactive' anglers remain parties to this case and eventually may be entitled to a portion of the interpleaded Prize Money.

This Court addressed several of these matters in its February 3, 2017 Memorandum Opinion and Order.[5]   (ECF Nos. 70, 71.)   By those papers, this Court: denied Heasley's Motion to Dismiss WMO from this case (ECF No. 56); stayed Kosztyu and Hutchison's Crossclaim against WMO (ECF No. 53);[6] and dismissed Kosztyu and Hutchison's Crossclaim against all other parties (ECF No. 54) and Complaint against Heasley (ECF No. 55).[7]

On March 17, 2017, plaintiffs, with leave of Court and consent of the parties, filed an Amended Complaint against Heasley.   (ECF No. 87.)   The Amended Complaint is the operative pleading in this case.   On March 31, 2017, Heasley timely filed his Answer to the Amended Complaint and asserted two Counterclaims against WMO.   (ECF No. 95.) Heasley's Counterclaims asserting Breach of Contract (Counterclaim I) and Breach of the Implied Covenant of Good Faith and Fair Dealing (Counterclaim II) are now ripe for this Court's resolution.   (*Id.*)

Several other pretrial matters bear on the conclusions reached below and, thus, are briefly addressed here.   As set forth in this Court' Memorandum Order dated March 29, 2017, there had arisen among the parties a dispute as to whether Heasley was required to disclose *whether* he, Morris, Bohannon, or Hagen took polygraphs subsequent to the filing of

---

[5] *White Marlin Open, Inc. v. Heasley*, RDB-16-3105, 2017 WL 467733 (D. Md. Feb. 3, 2017).

[6] Kosztyu and Hutchison's Crossclaim against WMO (ECF No. 53) remains STAYED and will be addressed in subsequent proceedings, if necessary.

[7] In addition, this Court determined that while WMO eventually may petition this Court for recovery of its attorney's fees and costs, WMO is not entitled to recover a figure amounting to *five times* its attorney's fees and costs, as initially claimed based on the 2016 Tournament Rules.   (ECF No. 70 at 9-12.)

the Complaint.[8]   (ECF No. 94.)   Heasley had asserted that this information was protected
under the attorney work-product doctrine and, therefore, was not discoverable.   (ECF No.
77.)   A briefing schedule was issued (ECF No. 79), and Heasley moved for a Protective
Order as to this information on March 8, 2017.   (ECF No. 80.)   As responsive briefs were
filed, Heasley disclosed to plaintiffs a "purported supplemental expert disclosure, naming an
entirely new expert witness—an additional polygraph examiner named John Palmatier."
(ECF No. 94) (quoting ECF No. 89.)   Through Dr. Palmatier, a polygraphist, Heasley
sought to introduce into evidence polygraph examinations taken by Heasley, Bohannon, and
Hagen **in March of 2017**—nearly seven months after the Tournament.   Plaintiffs moved to
exclude and/or strike Dr. Palmatier's testimony.[9]   (ECF Nos. 89, 90.)

Following a Motions Hearing on March 29, 2017, this Court stated in its
Memorandum Order that:

> "Heasley's Motion [for Protective Order] would be denied because the facts of
> whether, when, where, and by whom Heasley and the crew underwent post-
> complaint polygraph examinations were not privileged fact work product.
> Specifically … it was not clear whether any post-complaint polygraphs were
> taken 'in anticipation of litigation,' as they may have been taken as part of
> Heasley's efforts to avail himself of the WMO Tournament Rules.   Even more
> importantly … Heasley failed to demonstrate that the facts of whether, when,
> where, and by whom Heasley and the crew underwent post-complaint
> polygraph examinations involved 'the mental impressions, conclusions,
> opinions, or legal theories concerning the litigation,' and are, as a threshold
> matter, not privileged."

(ECF No. 94 at 3-4) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*,
967 F.2d 980, 984–85 (4th Cir. 1992)).   This Court also noted that:

---

[8] *White Marlin Open, Inc. v. Heasley*, RDB-16-3105, 2017 WL 1165955 (D. Md. Mar. 29, 2017).

[9] Plaintiffs' Motions to exclude and/or strike were construed as Motions *in limine* and/or for discovery
sanctions pursuant to Rule 37.   (ECF No. 94 at 3, n. 2.)

> "even if this information were privileged fact work product, Heasley unequivocally waived this privilege by attempting to make testimonial use of related work product material—that is, through his March 23, 2017 production of the Palmatier polygraph examinations of Heasley, Bohannon, and Hagen."

(*Id.* at 4) (citing *Nutramax Labs., Inc. v. Twin Labs. Inc.*, 183 F.R.D. 458, 463 (D. Md. 1998) (Grimm, J.)).   While Heasley thus was required to disclose whether, when, where, and by whom he and the crew underwent post-complaint polygraph examinations, he was not required to disclose the content of any subsequent polygraphs.[10]   (*Id.* at 4, n. 3.)   With respect to plaintiffs' motions to exclude, Heasley was ordered to produce for *in camera* review videos of Dr. Palmatier's polygraph examinations of Heasley and the shipmates.   (*Id.* at 5.)

This Court subsequently conducted an *in camera* review of the Palmatier polygraph examination videos, and concluded, by Memorandum Order dated April 14, 2017, that the testimony of Dr. Palmatier and the polygraph examinations which he proffered would be excluded pursuant to Rules 26(a)(2) and 37(c) of the Federal Rules of Civil Procedure, as well as the five-factor test set forth by the United States Court of Appeals for the Fourth Circuit in *Southern States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003).[11]   (ECF No. 99.)   Applying these factors, this Court found, *inter alia*, that the

---

[10] Although this Court noted that it would entertain a request to compel disclosure of the polygraph results themselves, plaintiffs did not pursue such disclosure.  *See* ECF No. 94 at 4, n. 3.

[11] *White Marlin Open, Inc. v. Heasley*, RDB-16-3105, 2017 WL 1364756 (D. Md. Apr. 14, 2017).  Under this test, the Court considers:

> (1)  the surprise to the party against whom the evidence would be offered;
> (2)  the ability of that party to cure the surprise;
> (3)  the extent to which allowing the evidence would disrupt the trial;
> (4)  the importance of the evidence; and
> (5)  the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* at * 2 (quoting *Southern States*, 318 F.3d at 596-97).

untimely disclosure: "came as a <u>significant</u> surprise to plaintiffs"; "would be highly prejudicial to plaintiffs"; was of little help to the Court as trier of fact;[12] and that no reasonable excuse justified the untimely produced evidence. (*Id.*) (emphasis in original.)

On March 3, 2017, plaintiffs Kosztyu and Hutchison moved for Summary Judgment based on Heasley's alleged failure to pass a polygraph examination as required under the Tournament Rules. (ECF No. 97.) By Memorandum Order dated April 24, 2017, this Court denied the Motion for Summary Judgment under the deferential standard of Rule 56 based on Heasley's having raised "genuine issues of material fact regarding the propriety of the WMO-administered polygraphs and whether WMO complied with its own rules following the 2016 Tournament."[13] (ECF No. 105 at 5.)

Significantly, the April 24 Memorandum Order also recapitulated the manner in which this case would proceed at trial, as agreed to by the parties during the March 29, 2017 Motions Hearing. (ECF No. 105 at 5, n. 4.) In particular, the Order stated that:

> "[T]he Court first must determine whether Heasley and WMO complied with their obligations under the Tournament Rules, or whether Heasley's performance (taking and passing a polygraph examination) was excused on account of a breach by WMO. In the event that Heasley's performance was excused as a result of a breach by WMO, the Court then would make factual determinations as to who is entitled to the Tournament prize money."

---

[12] With respect to the utility of the proposed evidence, this Court, having conducted an extensive *in camera* review, explained that:

> "First, the number, scope, and depth of the questions which pertain to the WMO tournament and whether any Tournament Rules were violated are remarkably limited. … Second, the examinations are rife with the coaching, commentary, and instruction of Dr. Palmatier. While this Court need not determine whether Dr. Palmatier's methodology passes muster under the federal *Daubert* standard, such obvious instruction to the examinee renders the proposed evidence of little probative value."

(ECF No. 99 at 6-7.)

[13] *White Marlin Open, Inc. v. Heasley*, RDB-16-3105, 2017 WL 1436282 (D. Md. Apr. 24, 2017).

(*Id.*)  Indeed, the parties presented evidence at trial and, later, submitted proposed findings of fact and conclusions of law consistent with this procedure.  (ECF Nos. 146, 147.)

Finally, the parties filed a series of Motions *in limine* regarding four proposed witnesses and two evidentiary matters.  (ECF Nos. 103, 108, 109, 112, and 113.)  These motions were denied for the reasons stated on the record on May 15, 2017.  (ECF No. 120.)

## FINDINGS OF FACT

Having conducted a nine day bench trial from May 22, 2017 through June 5, 2017, heard eyewitness and expert witness testimony, and considered the video and documentary evidence submitted by the parties, this Court makes the following findings of fact.

The White Marlin Open and the Tournament Rules

Jim Motsko, President of WMO, founded the White Marlin Open fishing tournament in Ocean City, Maryland in 1974.  (May 22 a.m. Tr. 66:22-24.)  After over forty years, the WMO is considered to be the world's largest billfish fishing tournament.  (*Id.* at 64:10-12.)  Over the years, as the Tournament's prize purses increased, WMO sought to ensure compliance with the Tournament Rules by instituting a polygraph provision.  This provision has been part of the WMO Tournament Rules since at least 2004.  (*Id.* at 70:9-71:23.)  Since then, WMO routinely has polygraphed all top prize winners.  Under the 2016 WMO Tournament Rules (the "Tournament Rules"), "any angler winning $50,000.00 or more may be required to take, and pass at the determination of the test administrator, a polygraph examination prior to the distribution of award money" by WMO.  (J.E. 25, Tournament Rule G.7.)  Motsko testified that the purpose of this rule is to ensure that the winning

anglers complied with the rules of the Open Tournament when they caught their winning fish.  (*Id.* at 70:9-71:23.)

Captain Paul Spencer is an experienced fisherman and boat captain who has participated in numerous big money tournaments, including the WMO.  (May 24 a.m. Tr. 35:4-36:1.)  Spencer is also the founder of Spencer Yachts, a custom boatbuilding company in North Carolina.   (*Id.* at 33:17-25.)   Spencer testified that the use of polygraph examinations in fishing tournaments is widespread.  (*Id.* at 36:2-10.)  Spencer further opined that: (a) it is very important for a tournament to have rules and to take steps to ensure compliance with the rules; (b) it is common for fishing tournaments to require polygraphs in an effort to reduce cheating; (c) the polygraph requirement has had the intended effect in big money tournaments of reducing cheating; and (d) it is common in big money tournaments for polygraphs to be required of all big money winners, regardless of any protest or allegation of wrongdoing.  (*Id.* at 42:19-43:14.)  Finally, Spencer opined that within the sport-fishing industry, the WMO Tournament has a reputation for integrity and fairness.  (*Id.*)

Several other WMO Tournament Rules were addressed during the course of the trial. First, each registered vessel was permitted to fish for up to three out of five days of the Tournament.  (J.E. 25 at C.1.)  Second, vessels were prohibited from passing the 'sea buoy' of the Ocean City Inlet before 4:00 a.m.[14]  (*Id.* at C.9.)  Third, vessels were prohibited from fishing outside of a one-hundred nautical mile distance from Ocean City, Maryland.  (*Id.* at C.11.)   Fourth, vessels were prohibited from deploying lines before 8:30 a.m. and from continuing to fish after 3:30 p.m.  (*Id.* at C.6.)  Finally, the WMO's "Hook-and-Hand" Rule,

---

[14] While boats may leave from any inlet between Barnegat Inlet in New Jersey and Rudee Inlet in Virginia, only the Ocean City Inlet, from which the *Kallianassa* fished, is relevant to this case.  (J.E. 25 at C.9-10.)

a WMO-specific (though regularly used) variation from International Game Fishing Association ("IGFA") rules, permitted a non-registered angler (such as a mate) to 'hook' a fish and immediately hand the rod to the registered angler, who would then fight and reel in the fish without assistance.  (*Id.* at E.3.)

The forty-third annual White Marlin Open Tournament was held from August 8 through August 12, 2016 in Ocean City, Maryland.  Defendant Heasley and each of the individual plaintiffs, including plaintiffs Kosztyu, Hutchison, and Conway, participated as anglers in the Tournament.  Heasley, competing on board the vessel *Kallianassa*, caught the Tournament's only qualifying white marlin, weighing 76.5 pounds, potentially entitling him to the first place prize money.  (J.E. 72.)  Kosztyu, competing on board the vessel *Hubris*, caught a 236.5 pound big eye tuna.  (May 24 a.m. Tr. 55:4-6.)  Hutchison, competing on board the vessel *Magic Moment*, caught a 233 pound big eye tuna.  (*Id.* at 57:9-11.)[15]

Defendant Philip Heasley and the Crew of the *Kallianassa*

Defendant Philip Heasley is a citizen of the State of Florida and the owner of the vessel *Kallianassa*, a 68-foot Hatteras fishing boat.  (May 30 a.m. Tr. 3:4-5.)  Heasley hired David Morris to be the captain of the *Kallianassa* in March 2016 following the retirement of Heasley's previous captain, David Day.  (*Id.* at 10:2-11:14.)  Heasley, through Captain Morris, hired first mate Kyle Bohannon to work on the *Kallianassa* beginning in April 2016.  (*Id.*) Among Morris and Bohannon's responsibilities were to transport the vessel seasonally between Naples, Florida and Nantucket, Massachusetts, as well as to fishing tournaments in which Heasley and his crew chose to participate.  The WMO was only the second fishing

---

[15] Plaintiff Conway did not present any evidence at trial regarding his catch.  The Amended Complaint alleges that Conway, competing on board the vessel *Get Reel*, caught a 790 pound blue marlin.  (ECF No. 87 at ¶ 6.)

tournament in which Heasley participated with Morris and Bohannon. (*Id.*) The fourth member of the *Kallianassa* during the WMO was second mate John Hagen. Heasley first met Hagen the day before the start of the WMO in August 2016. (*Id.*) Mate Bohannon was the only member of the *Kallianassa* who had participated in the WMO previously; he did so in 2014. (May 30 p.m. Tr. 38:4-8.)

Morris and Bohannon transported the *Kallianassa* from Nantucket to the White Marlin Marina in Ocean City, Maryland during the week prior to the WMO's start, arriving on Wednesday, August 3, 2016. (June 1 a.m. Tr. 74:16-19.) Heasley arrived in Maryland the day before the start of the Tournament (i.e., August 7), and attended the Tournament Captains' Meeting that evening with Captain Morris. (June 1 a.m. Tr. 57:9-12.) At the Captains' Meeting, anglers were able to raise any questions regarding the Tournament Rules with WMO officials. Heasley testified, however, that he had not read the rules, but merely glanced at them. (May 30 a.m. Tr. 12:1-3.)

The crew of the *Kallianassa* also held a meeting that night in order to address each shipmate's responsibilities during the Tournament. (May 30 a.m. Tr. 12:4-22.) Morris was responsible for navigation, piloting, and timekeeping. Bohannon and Hagen were responsible for tackle and bait. The mates were also charged with deploying the fishing lines and helping to hook any fish, as permitted under the WMO's "Hook-and-Hand" Rule.[16] Heasley, as the only registered angler, was responsible to fight and reel in any fish caught

---

[16] Heasley testified that he was familiar with the Hook-and-Hand rule and that it was very common in large fishing tournaments. (May 30 a.m. Tr. 13:16-24.) Morris understood and was familiar with this rule. (June 1 a.m. Tr. 56:21-57:9.) Bohannon had participated in tournaments where the rule applied. (May 30 p.m. Tr. 43:13-18.) Hagen had no prior experience in tournaments where this practice was permitted. (May 31 p.m. Tr. 56:22-25.)

during the Tournament.[17]

The *Kallianassa* fished on Monday, August 8, 2016, the first day of the Tournament, but was unsuccessful and did not report any catches that day.  (May 31 a.m. Tr. 3:16-4:1.)

The *Kallianassa* on Tuesday, August 9, 2016

On Tuesday, August 9, 2016, Captain David Morris awoke at 3:45 a.m., having set an alarm on his iPhone.  (June 1 a.m. Tr. 58:15-22.)  Morris planned to leave the dock at 4:30 a.m.  (*Id.* at 60:1-4.)  Mates Bohannon and Hagen also awoke to their mobile phone alarms at around 3:45 a.m. in order to assist Morris in departing from the dock.  (May 30 p.m. Tr. 46:15-21.)  The mates then returned to sleep in their staterooms until around 7:30 a.m., when they were again awoken by their alarms.  (*Id.* at 48:19-25.)  While Morris, Bohannon, and Hagen all used their mobile phones as alarms and testified that they periodically checked their phones for the time, no person on board the *Kallianassa* wore a watch on Tuesday, August 9, 2016.  (*Id.*; June 1 a.m. Tr. 58:23-59:12; May 30 a.m. Tr. 84:25-85:5.)

Records from the *Kallianassa*'s onboard "Leviathan" computer system, reviewed by Heasley's forensic computer expert Michael Perry, indicate that the ship's engines were started at 4:26 a.m.  (June 1 p.m. Tr. 56:13-20.)  Between 4:26 and 4:40 a.m., the *Kallianassa* departed the dock at the White Marlin Marina, left the Ocean City Inlet, and eventually reached a cruising speed of approximately 22 knots at 1800 RPM.  The Leviathan computer and the vessel's GP Link satellite system indicate that *Kallianassa* remained at this cruising speed from 4:40 a.m. until 7:50 a.m.  (*Id.* at 57:9-17.)

At around 5:00 a.m., Heasley awoke and joined Morris on the bridge.  (May 30 a.m.

---

[17] Only fish caught by a registered angler are eligible as a catch (or catch-and-release) under the WMO Tournament Rules.

Tr. 15:3-20.)  With the ship on autopilot, Morris turned over command of the *Kallianassa* to Heasley, who remained in control until Morris' return to the helm at around 6:30 a.m.  (June 1 a.m. Tr. 61:19-25.)  The ship continued to travel at approximately 21 knots in the direction of the Baltimore Canyon, southeast of Ocean City.  (*Id.* at 62:3-5.)

At 7:51 a.m., the *Kallianassa* began to slow to a trolling speed of approximately 7 knots, slowing initially to 1551 RPM, then to 884 RPM by 7:59 a.m., and to 594 RPM at 8:04 a.m.  (June 1 p.m. Tr. 58:19-61:19.)  According to the Leviathan system, the *Kallianassa* remained at this trolling speed of 500-700 RPM (approximately 7 knots) from 8:04 a.m. until 12:02 p.m.  (*Id.*)  The GP Link data similarly shows that the vessel travelled at a speed of approximately 7 knots from 8:08 a.m. until at least 11:38 a.m.[18]  (June 2 a.m. Tr. 7:23-8:4.) Thus, the *Kallianassa* was at a trolling speed, appropriate for the deployment of fishing lines, well before 8:30 a.m.

When it began trolling, the *Kallianassa* was situated approximately 20-30 nautical miles southeast of the Baltimore Canyon and was trailing a school of skipjack tuna which Captain Morris had spotted in the water.  (June 1 a.m. Tr. 5:15-25.)  The experienced fisherman testified that marlin eat skipjack tuna, so he suspected that his intended catch would be swimming nearby.  (*Id.* at 7:3-4.)

---

[18] Perry testified that the GP Link system records data every 30 minutes. The GP Link's Position Data Report shows that the vessel accelerated from 7 to 25 knots between 11:38 a.m. and 12:08 p.m.  (Def.'s Ex. 114.)

<u>The Catch</u>

Several broad facts regarding the *Kallianassa*'s August 9 catch of the white marlin are largely undisputed:

- Captain Morris was piloting the boat when the lines were deployed (June 1 a.m. Tr. 63:14-21);

- Captain Morris gave the 'lines in' command to the mates (May 30 a.m. Tr. 22:25-23:16);

- Hagen hooked the white marlin (May 30 a.m. Tr. 92:22-93:3);

- Hagen handed the rod to Heasley (May 30 a.m. Tr. 92:22-93:3);

- Heasley fought and reeled in the white marlin (May 30 a.m. Tr. 92:22-93:3);

- Bohannon grabbed the leader line to pull the white marlin close to the boat (May 30 a.m. Tr. 90:8-18);

- Hagen gaffed the white marlin on his second attempt (May 30 a.m. Tr. 30:7-24);

- Bohannon and Hagen pulled the fish onto the boat (May 30 a.m. Tr. 30:7-24);

- The *Kallianassa* fished until approximately 12:00 p.m. (June 1 a.m. Tr. 97:9-16);

- The *Kallianassa* returned to the White Marlin Marina between 3:00-4:00 p.m. (June 1 a.m. Tr. 98:16-99:3);

- The WMO Tournament's weigh-in scales opened at 4:00 p.m (June 1 a.m. Tr. 98:16-99:3).

**Crucially, it is also undisputed that the *Kallianassa*'s 76.5 pound white marlin was on board the vessel before 8:58:47 a.m.** (Plaintiffs' Proposed Findings, ECF No. 146 at ¶ 53.a; Defendant's Proposed Findings, ECF No. 147 at ¶ 15.)   At trial, Captain Morris testified that he entered Waypoint 76 into the *Kallianassa*'s Garmin GPS system at that time,

after "the fish was in the boat and things had settled down."[19]   (June 1 a.m. Tr. 88:15-89:1.)

*See also* June 1 a.m. Tr. 90:9 ("After the fish was boated, I punched in my waypoint.").   Other

than the broad facts noted above, the evidence and testimony presented at trial contain

highly divergent accounts of the actions and events that preceded Captain Morris' entry of

Waypoint 76 at 8:58:47 a.m., only 28 minutes and 47 seconds after the *Kallianassa* was

allowed to deploy its fishing lines under the WMO Tournament Rules.[20]   That is, there are

significant differences in the accounts given by each crew member of the *Kallianassa*

regarding: (1) how long it took to deploy all of the ship's fishing lines; (2) how long it took to

hook the white marlin; (3) how long it took Heasley to fight and reel in the fish; and (4) how

long it took to gaff and pull the fish into the boat.   Presented with such conflicting

testimony, this Court must make factual and credibility determinations as to which evidence

most accurately reflects the events which occurred on the open sea on the morning of

August 9, 2016.

This Court first considers the account given by Heasley and Morris on a video taken

by WMO on the afternoon of August 9, 2016 at the fish weigh-in station at the White Marlin

Marina.  (J.E. 52.)  The relevant portion of the video provides:

INTERVIEWER:   I'm here with Phil Heasley…uh…from the *Kallianassa*.
With our first qualifying white marlin, 76 and a half
pounds.  How was the fight with the fish?

HEASLEY:   It was great.  Um.  Gave us a good fight.

MORRIS:   Good fight.  First thing in the morning.

---

[19] Heasley's forensic computer expert Michael Perry confirmed that the waypoint was manually entered into the Garmin GPS system at that time.

[20] As noted, the WMO Rules prohibited vessels from deploying lines before 8:30 a.m.  (J.E. 25 at C.6.)

| INTERVIEWER: | About how long? |
|---|---|
| HEASLEY: | No idea. |
| MORRIS: | Ten minutes. |

(J.E. 52, 1:58-2:19.)[21]

This Court then considers the account given by Heasley during a video interview with WBOC 16's "Outdoors Delmarva" program on August 9, 2016, also at the White Marlin Marina.  (J.E. 51.)  On that video, Heasley, referring to the 76.5 pound white marlin, states:

| HEASLEY: | **We actually caught this about 20 minutes after, uh, lines down.** |
|---|---|
| INTERVIEWER: | Yeah. |
| HEASLEY: | And we kept saying do we have enough ice and whatnot. So I think we could have caught several more. |
| INTERVIEWER: | Really? |
| HEASLEY: | It was really pretty active out there. |

(J.E. 51, 1:08-1:20) (emphasis added.)[22]

This Court also considers the *Kallianassa*'s August 9, 2016 Catch Report, signed by Heasley and Morris, which states that the time of the catch was 9:05 a.m.  (J.E. 72.)  The Court notes that the time of the first reported catch on the report has been modified.  (*Id.*) During his testimony, Mate Bohannon stated that he had originally written 10:15 a.m. on the space provided to record the day's first catch.  (May 30 p.m. Tr. 78:15-79:12.)  That time, as the Report reflects, was the time of the *Kallianassa*'s second catch (a released fish) on August

---

[21] No transcript of this video was provided. The foregoing transcription was prepared by the Court.  (J.E. 52.)

[22] No transcript of this video was provided. The foregoing transcription was prepared by the Court.  (J.E. 51.)

9. Thus, Bohannon stated that he over-wrote "09:05" where he had originally written "10:15." (*Id.*)

This Court also has reviewed the accounts given by the crew of the *Kallianassa* during their video recorded polygraph examinations with Paul Carey (Heasley and Morris) and David Saneman (Heasley, Bohannon, and Hagen). (J.E. 1, 3, 5, 9, 13.) Transcripts of these videos were also admitted into evidence. (J.E. 81.) Divergent accounts of the timing of the relevant events on Tuesday, August 9 emerge from the pre-test interviews to the examinations. During his pre-test interview with Mr. Carey, Heasley stated:

> Q [Carey].   How long did it take you to fight it in?
>
> A [Heasley].   You know what, I would tell you 20 minutes, but I don't wear a watch so that's –
>
> Q.   Plus when you get excited, time distorts somewhat.
>
> A.   So I'm saying what the actual time was, you probably have to ask someone else. I would say about, to me it was 20 minutes. But maybe it was 10 and maybe it was 30.

(Carey-Heasley Tr. 11:13-21.) Morris also underwent a polygraph examination with Mr. Carey. During his pre-test interview, Morris responded to examiner Carey's question about how long it took to bring the fish in as follows: "About 10 minutes, 15 minutes. Not, you know, not super long. I really don't remember exactly. But it wasn't an epic, you know, it's a white marlin. It's not a – you know, 15 minutes maybe." (Carey-Morris Tr. 12:18-21.)[23]

Heasley underwent a second polygraph examination on August 21, 2016. During his pre-test interview with David Saneman, Heasley stated that he didn't "know whether it took

---

[23] The Court finds significantly less probative Morris's later statement, <u>made after Carey informed Morris that he had failed the polygraph examination</u>, that "[w]e fought a fish for ten minutes, the kids gaffed it and put it in the fish box." (Carey-Morris Tr. 80:1-2.)

me 10 or 30 minutes to reel it…" (Saneman-Heasley Tr. 28:16-17.)  Heasley later stated:

Q [Saneman].  Were there any lines dropped before 8:30?

A [Heasley].  No, sir.

Q.            In the morning?

A.            No way.  And there was nothing kept after 4:30 either.

Q.            After 3:30.

A.            Yeah.  3:30.  No, there was nothing.
             …
             You have to have the dredges out and then you drop back the
             lines and whatnot.

Q.            You can actually put the dredges out before 8:30?

A.            No.  No.

Q.            Nothing in the water before 8:30?

A.            I'm saying we didn't put anything – **so we didn't even at 8:30,
             we didn't put anything that had a hook on it down for
             probably ten minutes because we have to get the dredges
             and the teasers out before we have the hooks out.**
             So, no, I'm not the least bit – and that's why we caught – well,
             we caught the fish at like 9:15 or whatever it was.  We had just
             started fishing right.

(Saneman-Heasley Tr. 46:2-47:9) (emphasis added).

Mates Bohannon and Hagen also underwent polygraph examinations with Saneman

on August 21, 2016.  During his pre-test interview with Saneman, Bohannon demonstrated

confusion about the time at which boats were permitted to deploy their lines under the

WMO Tournament Rules.  At one point, Bohannon stated that the *Kallianassa* put its first

bait in the water at 8:00 a.m. (Saneman-Bohannon Tr. 16:16-20.)  Bohannon then modified

his response to assert that he and his shipmates did not deploy lines until after 8:30 a.m.  (*Id.*

at Tr. 16:21-18:3.)   Later in the pre-test interview, Bohannon took a break and left the

examination room.   When he returned, without any prompt or question by Saneman,

Bohannon stated: "Now the only thing that I was actually aware about that I told you, 8:00

and it was at 8:30.  I know we didn't start fishing until 8:30." (*Id.* at 44:1-3.)

With respect to the events of Tuesday, August 9, 2016, Bohannon stated during his

pre-test interview with Saneman:

| | | |
|---|---|---|
| Q [Saneman]. | Okay.  What time did you start fishing? | |
| A [Bohannon]. | 8:30. | |
| Q. | And then what happened? | |
| A. | **We fished for maybe about 30 minutes when we hooked the fish.** | |
| … | | |
| Q. | **How long did you fight that fish?** | |
| A. | **About, maybe 20 minutes.  15.** | |

(Saneman-Bohannon Tr. 23:14-24:7) (emphasis added.)   During his pre-test interview with

Saneman, Hagen stated that the *Kallianassa* deployed its lines at 8:30 and that, "…the one

that we brought in was, that was the first fish we caught of the day.  I think we got that one

at like 9:00, right around there." (Saneman-Hagen Tr. 23:21-24:3.)

Finally, this Court considers the testimony given at trial and the deposition testimony

referred to during cross-examination of the respective witnesses.   First, this Court notes

Heasley's testimony on cross-examination, during which Mr. Heasley stated that it took his

crew approximately fifteen (15) minutes to deploy the *Kallianassa*'s fishing "spread" of lines,

baits, teasers, lures, and dredges on August 9, 2016.[24]   (May 30 p.m. Tr. 6:10-20.)    During this examination, Heasley recognized and stood by his prior deposition testimony that the deployment of the spread was "not a one or two or three minute exercise…"   (*Id.* at 7:4-8.) Heasley also testified that his boat's first bite on Tuesday morning occurred around 9:00 a.m. (*Id.* at 7:16-19.)   In addition, Heasley testified that he recognized a photograph of the 'boated' white marlin taken by Captain Morris on the *Kallianassa* at 9:09:08 a.m.   (J.E. 65, Heasley 000048.)   The overhead photograph depicts Heasley standing up and the white marlin lying in the ship's Yeti cooler.[25]

Captain Morris gave a strikingly different account of the morning of August 9, 2016 during his testimony.   While Heasley had testified that the first bite on Tuesday morning occurred around 9:00 a.m., Morris testified that at 8:58:47 a.m., when he entered Waypoint 76 into the Garmin GPS, the fish was already "in the boat and everything settled down." (June 1 a.m. Tr. 88:17-19.)   Morris testified that it had taken ten minutes for Heasley to fight and reel in the fish from the time that Hagen hooked it.   (*Id.* at 90:1-3.)   Morris also stated that he was involved in measuring the fish and calculating its approximate weight; Morris recited the "girth$^2$ x length / 800" formula used to calculate the white marlin's approximate weight.   (*Id.* at 91:12-13.)

---

[24] A diagram of the *Kallianassa*'s fishing spread is attached as Exhibit A to this opinion.  (Def.'s Ex. 194.)

[25] Heasley and Morris also testified about their KVH satellite telephone calls to WMO starting at 9:28 a.m. on Tuesday, August 9, 2016.   (J.E. 74.)   Heasley and Morris testified that after they determined that the 76.5 pound white marlin would not fit in their cooler, they called WMO seeking guidance on whether they could break the fish's backbone in order to make it fit in the cooler.   WMO officials advised the crew of the *Kallianassa* not to mutilate the fish, and there is no evidence that the white marlin was mutilated (other than the gaff hole) in violation of the Tournament Rules.
  The satellite phone records are of little probative value, however, as they only tend to prove that the white marlin was on board the *Kallianassa* prior to 9:28 a.m., a fact which is not in dispute.  The timing of the phone calls does not indicate how long prior to 9:28 a.m. the fish was caught or brought on to the boat.

First Mate Bohannon discussed in detail his activities preparing the *Kallianassa*'s bait, tackle, and equipment. (May 30 p.m. Tr. 45:14-46:11.) On the evening of August 8, Bohannon and Hagen began preparing the hundreds of baits which they would deploy the following morning. (*Id.*) Bohannon testified that each of the two mates rigged approximately 200 dredge baits, 200 natural baits, 20 pitch baits, and 10 teaser baits to be used on August 9. Bohannon testified that on the morning of August 9, it took only one to two minutes to deploy the entire spread.[26] (*Id.* at 56:3-4.) Bohannon testified that a fish hit the spread "not too long" after it was deployed; he was not able to specify how many minutes later that occurred. (*Id.* at 56:7-8.) On cross-examination, Bohannon testified that ten to fifteen minutes into Heasley's fight with the fish, the fish was jumping in the water, sixty yards away from the *Kallianassa*'s port side. (*Id.* 101:1-7.) Bohannon further testified that it took another five to seven minutes for Heasley to reel in the fish. (*Id.* at 102:10-103:1.)

---

[26] Bohannon carefully described many of the tasks he and Hagen performed in deploying the *Kallianassa*'s spread. (May 30 p.m. Tr. 53:12-56:4.) An illustrative portion of Bohannon's testimony is quoted here for ease of reference:

> Q [Erickson]. Sir, again referring to the diagram [Def.'s Ex. 194; Exhibit A, *infra*] now, please describe how the spread was deployed after Captain Morris gave lines in order?
>
> A [Bohannon]. After Captain Morris said lines in, I was holding line E in my hand. I placed the bait in the water. I was making sure it was swimming like a natural fish would. After that was going on, I let that go, picked up the rod, put it into free spool. Put out the line C at the same time, put that in a free spool. They're both going out. And then I knocked in line D, so all three of those are going out at the same time. And Captain Morris is controlling line D where he wants that. After I get both line C and E where I want them, I put the drags on them, put them both in their respective rod holders. And then I put in line B, which is the dredge. And then I put in line A, make sure it's swimming correctly like a natural bait would be swimming, put it out to the length that's desired. And then I clip it into the transient clip and put it in the rod holder.

(*Id.* at 53:12-56:4.) *See* Exhibit A, *infra.*

Second Mate Hagen did not meet Heasley until the day before the 2016 WMO Tournament began. (May 30 a.m. Tr. 11:4-6.) With respect to the morning of August 9, Hagen testified Morris gave the command to deploy the ship's fishing spread and that it took between two and four minutes for him and Bohannon to deploy the entire spread. (May 31 p.m. Tr. 62:13-63:9.) Hagen further testified that the fish hit the *Kallianassa*'s spread "around 20 minutes after we deployed the spread..." (*Id.* at 13-16.) Hagen grabbed the rod which had been hit and proceeded to hook the fish. He then handed the rod to Heasley.[27] Hagen testified that after he handed Heasley the rod, it took Heasley "around 10 minutes" to bring the fish on board. (*Id.* at 75:1-3.)

In sum, this Court has considered carefully the video, documentary, and testimonial evidence regarding the times at which the *Kallianassa*'s lines were deployed and the 76.5 pound white marlin was caught. This Court has also assessed the credibility and reliability of the evidence and witnesses presented, including any identifiable biases which they may have.[28]

Based on the foregoing, this Court finds credible Heasley's testimony that it took **between ten and fifteen minutes** for Bohannon and Hagen to deploy the *Kallianassa*'s fishing spread. This evidence is consistent with Heasley's statement to Saneman during the

---

[27] A further inconsistency in Hagen's testimony was his statement that Heasley wore a fighting belt when catching the white marlin. (May 31 p.m. Tr. 104:9-106:14.) All of the other crew members of the *Kallianassa*, including Heasley himself, testified that Heasley did not wear a fighting belt to catch the fish. Whether Heasley wore a fighting belt is of no consequence to this case. The inconsistencies among the witnesses' testimony, however, bears on their credibility.

[28] Of particular note is the *Kallianassa*'s Prize Money Distribution Form, signed by Heasley on August 13, 2016. (J.E. 22.) This form indicates that of the $2,818,662.00 in prize money claimed by the *Kallianassa*, payment was to be made as follows: $1,415,831.00 to Heasley; $832,690.60 to Morris; $416,349.30 to Bohannon; $138,783.10 to Hagen; and $15,000.00 to non-participant David Day. (*Id.*)

pre-test interview on August 21, 2016 that it took at least ten minutes to deploy the dredges and teasers before the hooks.  It is also consistent with Heasley's deposition testimony, referred to during cross-examination, that deploying the lines was "not a one or two or three minute exercise."  (May 30 p.m. Tr. 7:6-7.)  This Court does not credit the testimony of Bohannon and Hagen that it took only one to four minutes to deploy the ten lines which the *Kallianassa* used on the morning of August 9, 2016.  As Exhibit A and Bohannon's own testimony regarding the many tasks involved in deploying the lines make clear, his assertion that all of these tasks were performed in one to four minutes is not credible.

In addition, this Court finds that it took **fifteen to twenty minutes** for the fish to bite and Mate Hagen to hook the 76.5 pound white marlin.  On the day of the catch, Heasley stated to the WBOC interviewer that he and his crew "caught" the fish only twenty minutes after lines down.  Because Heasley admitted to not having read the WMO Tournament Rules (he merely glanced at them), testified to relying on Captain Morris to determine when the lines should be deployed, did not deploy the lines himself (Bohannon and Hagen performed this task), and did not wear a watch, there is no basis on which to construe Heasley's statement as referring to the WMO's 8:30 a.m. 'lines down' time.  Rather, Heasley's statement is more reasonably understood as asserting that the fish was hooked twenty minutes *after the* Kallianassa *deployed its lines.*  That Heasley was referring to the hooking—not the fighting and reeling in—of the fish is further supported by the statement of Bohannon to examiner Saneman that "[w]e fished for maybe about 30 minutes when we hooked the fish."  (J.E. 81, Saneman-Bohannon Tr. 23:14-24:7.)  Deducting the ten to fifteen minutes which it took to deploy the lines, Bohannon's statement indicates that the

fish was hooked fifteen to twenty minutes after the lines had been deployed.  Taking into account this evidence and Heasley's August 9 statement that the fish was caught twenty minutes after lines down, this Court finds that between fifteen and twenty minutes passed between the deployment of the lines and Hagen's hooking of the fish.

This Court further finds that it took **between ten and fifteen minutes** for Heasley to fight and reel the fish to the side of the *Kallianassa*.  Morris's August 9 statement to the WMO Interviewer that the fight lasted only ten minutes is not entirely credible.  Morris told Carey only four days later that the fight lasted approximately ten to fifteen minutes.  Moreover, Heasley has repeatedly estimated the fight to have taken between ten and thirty minutes, with his best guess being fifteen minutes.  Bohannon similarly estimated the fight to have lasted between fifteen and twenty minutes.  Absent any objective evidence and in the face of these conflicting accounts, this Court finds that the fight lasted ten to fifteen minutes.

As noted above, the crew of the *Kallianassa* undertook several other activities before Morris entered Waypoint 76 on the Garmin GPS at 8:58:47 a.m., the undisputed time by which the fish was on board the *Kallianassa*.  Once Heasley had reeled the fish to the side of the boat, Hagen gaffed the fish.  All members of the *Kallianassa* testified that it took Hagen two attempts to gaff the white marlin, having missed at his first attempt.[29]  After gaffing the fish, Bohannon and Hagen pulled the fish on board the boat.  Morris testified that it was at this point, "once we got him in the boat and everything settled down," that he entered

---

[29] The amount of time which it took to gaff and pull the fish onto the boat is unknown.

Waypoint 76 into the Garmin GPS.[30]  (June 1 a.m. Tr. 88:17-19.)

**These forgoing facts compel the finding that the *Kallianassa* deployed its lines before 8:30 a.m. on Tuesday, August 9, 2016.  The findings set forth above indicate that the *Kallianassa* deployed its lines between thirty-five (35) and fifty (50) minutes before 8:58:47 a.m.—that is, between 8:08 and 8:23 a.m.**  This conclusion is consistent with the *Kallianassa*'s onboard electronics systems which, as noted, indicate that the vessel was at a trolling speed, appropriate for deploying fishing lines, by 8:04 a.m.

The *Maverick* Testimony

At trial, Heasley called as witnesses Captain Joel McLeod and Mate Neil Ashley of the vessel *Maverick*.  The *Maverick* also competed in the 2016 WMO and was fishing in the vicinity of the *Kallianassa* on the morning of August 9, 2016.  (June 1 a.m. Tr. 5:12-6:8.)  The crew of the *Kallianassa* testified that they saw the *Maverick* that morning, and McLeod and Ashley likewise testified that they saw the *Kallianassa*.  There are notable differences among the witnesses' accounts of how they identified the other vessel.  Heasley testified that he could read the name *Maverick* on the boat during his fight with the white marlin.  (May 30 a.m. Tr. 27:12-23.)  Morris testified that he recognized the profile of the *Maverick*, a 57-foot Ricky Scarborough custom boat.  (June 1 a.m. Tr. 3:10-11.)  In addition, Morris knows its captain, Joel McLeod, through the professional sport-fishing community.  (June 1 p.m. Tr. 27:22-24.)  Bohannon and Hagen stated that they could not see the *Maverick* while the fish was being hooked, but saw it after Morris turned the *Kallianassa* during the fight.  (May 30

---

[30] Bohannon and Hagen also measured the fish and determined that it was of qualifying length and weight. Morris testified that he was involved in the measurement of the fish and that the measurements occurred after he entered Waypoint 76 into the Garmin system.  (June 1 a.m. Tr. 90:8-11.)

p.m. Tr. 61:5-62:8; May 31 p.m. Tr. 80:1-7.)   McLeod and Ashley testified that they recognized the "70-foot Hatteras"[31] from the White Marlin Marina, where it had been docked in a highly visible location.  (June 1 a.m. Tr. 5:6-11; 6:17-18; 30:18-20.)

McLeod testified that he saw the *Kallianassa* around 8:00 a.m.  (June 1 a.m. Tr. 6:5-8.)  At that time, he stated, the *Maverick* was 100 to 200 yards from the *Kallianassa*'s starboard side and pursuing a school of tuna.[32]  (*Id.* at 6:21-7:2.)  McLeod testified that he did not see the *Kallianassa* deploy its lines, but merely assumed that the *Kallianassa* did not deploy its lines before 8:30 a.m.  (*Id.* at 7:15-21; 17:13-18:13.)  McLeod further testified that he saw the *Kallianassa* catch the white marlin approximately fifteen to twenty minutes after 8:31 a.m., the time at which the *Maverick* deployed its lines.  (*Id.* at 8:10-12.)  McLeod also testified on cross-examination that between ten and thirty minutes after he saw the *Kallianassa* catch the fish, the *Kallianassa*'s cockpit shade was pulled down and the vessel began heading to shore at a cruising speed.  (*Id.* at 12:21-14:5.)

Ashley testified that as the *Maverick* pursued a school of skipjack tuna at around 8:00 a.m., the vessel was "several hundred yards" away from the *Kallianassa*'s starboard side. (June 1 a.m. Tr. 29:14-25.)  Ashley did not see the *Kallianassa* deploy its lines that morning. (*Id.* at 31:13-16.)  This is unsurprising, as Ashley was the only mate responsible for seven fishing rods for the "9 or 10…guests and fisherman" on the *Maverick* that morning.  (*Id.* at 35:19-22; 36: 10-12.)  Ashley testified that he saw the *Kallianassa*'s white marlin hooked and jumping at 8:45 a.m.  (*Id.* at 32:18-20.)  During the *Kallianassa*'s fight with the fish, the

---

[31] It is apparent that Ashley's statement was only intended to be approximate.  The *Kallianassa* is a 68-foot Hatteras fishing boat.

[32] The Court notes that on cross-examination, McLeod stated that the *Maverick* was even closer to the *Kallianassa*—only "80 or a hundred yards" away.  (June 1 a.m. Tr. 17:7-9.)

*Maverick* turned "away from them offshore, so back towards the east." (*Id.* at 33:9-10.) At the same time, the *Kallianassa* "began to back down" towards the fish—that is, moved in reverse towards the white marlin in order to assist the angler in reeling in the fish.[33] (*Id.* at 33:7-9.) Ashley also testified that he saw that the *Kallianassa*'s cockpit shade was pulled down between 12:00—1:00 p.m. when the vessel headed to shore. (June 1 a.m. Tr. 41:16-18.)

There is a striking disparity between McLeod and Ashley's testimony regarding the time when the *Kallianassa* pulled down its cockpit shade and began to "run in" towards shore. McLeod testified that these events occurred 10 to 30 minutes after the *Kallianassa* caught its white marlin. (June 1 a.m. Tr. 12:21-14:5.) Ashley stated that the *Kallianassa* headed to shore with its cockpit shade down between 12:00—1:00 p.m. (*Id.* at 41:16-18.) These conflicting accounts certainly suggest that they saw the *Kallianassa* later that morning, between 11:00 a.m. and 12:00 p.m., when the *Kallianassa* made its *third* catch of the day. This possible explanation is consistent with other record evidence. First, the *Kallianassa*'s Catch Report states that its third catch occurred at 11:20 a.m. (J.E. 72.) Moreover, the *Kallianassa*'s onboard computers reflect the fact that the vessel accelerated from its trolling speed to a cruising speed just after 12:00 p.m. on August 9. Specifically, the Leviathan system shows that the *Kallianassa* accelerated from its trolling speed to a cruising speed of 1800 RPM at 12:02 p.m. and remained at that speed until 3:00 p.m. The GP Link data show that between 11:38 a.m. and 12:08 p.m., the ship accelerated from 7 to 25 knots, and continued at that speed until after 2:38 p.m. (Def.'s Ex. 114.) Thus, it may be that McLeod and Ashley have

---

[33] Based on these movements, it is apparent that Ashley's ability to view the *Kallianassa*'s cockpit was more limited than certain details of his testimony might suggest.

interposed later events that morning with those they claim to have witnessed between 8:30 and 9:00 a.m.

In assessing the credibility of the *Maverick* testimony, this Court notes the relationships which exist among McLeod, Ashley, and Captain Morris.  Specifically, Mate Ashley testified that he is good friends with Captain Morris's son, Tyler Morris.  (June 1 a.m. Tr. 42:3-6.)  What is more, on the witness stand, Ashley clearly acknowledged his bias in this matter when he stated that he found it unfair that the prize money had not been disbursed to the crew of the *Kallianassa*.  (*Id.* at 43:6-15.)  Ashley also testified that Tyler Morris works as a mate for Randy Yates, the captain of the vessel *Miss Annie*.  (*Id.* at 42:7-25.)  Morris testified that he had fished with Yates and his son Tyler on board the *Miss Annie* on August 5, 2016, the Friday before the WMO Tournament began.  (June 1 p.m. Tr. 27:9-21.)  In addition, Ashley and McLeod both testified that Randy Yates is a friend of Joel McLeod.  (*Id.* at 42:7-25; *id.* at 22:24-23:16.)  Ashley also testified that he has fished with Yates and Tyler Morris on the *Miss Annie*.  (June 1 a.m. Tr. 42:7-25.)  While this network of relationships may help to explain how or why Heasley came to rely on their testimony, it very much undermines the credibility which this Court affords McLeod and Ashley's accounts.

In sum, this Court attributes little weight to the testimony of McLeod and Ashley on account of the inconsistencies that exist in their account of the *Kallianassa*'s catch and their bias based on their relationships with members of the *Kallianassa*.

<u>The August 13 Polygraphs (Heasley, Kosztyu, Hutchison, Conway, and Morris)</u>

Pursuant to Rule G.7 of the WMO Tournament Rules, WMO requested that all of the top prize winning anglers—Heasley, Kosztyu, Hutchison, and Conway—undergo

30

polygraph examinations.  (May 23 p.m. Tr. 8:8-10.)  On the evening of Friday, August 12, after the WMO weigh-in scales had closed, WMO Tournament Director Madelyn Rowan called Captain Morris to notify him that Heasley should report to the Clarion Hotel in Ocean City at 8:00 a.m. the following morning to undergo a polygraph examination.  (*Id.* at 8:8-9:10.)  Morris understood Rowan's instructions and conveyed them to Heasley.  Later that evening, the crew of the *Kallianassa* went out to dinner at O.C. Wasabi to celebrate their apparent victory in the Tournament.  (J.E. 81, Carey-Morris Tr. 37:18-20.)

At 8:00 a.m. on Saturday, August 13, Heasley reported to the Clarion for his polygraph.  (May 30 a.m. Tr. 40:12-41:5.)  There, Heasley met the WMO's designated polygraph examiner, Paul Carey.  Carey had worked as a polygraph examiner for the Maryland Natural Resources Police prior to starting his own polygraph company.  (May 24 a.m. Tr. 59:4-62:14.)  He was trained as a polygraphist in 2007 at the Northeast Counterdrug Training Center in Pennsylvania, a school accredited by the American Polygraph Association ("APA").  (*Id.*)  He has performed hundreds of tests in his career, including for numerous fishing tournaments, including the WMO, the Ocean City Tuna Tournament, and the 'Diamond Jim' Fishing Competition.[34]  (*Id.*)  Carey is a member of both the Maryland Polygraph Association and the APA.  (*Id.*)  This Court finds that Carey is a qualified polygraph examiner, and it was reasonable for WMO to hire him.

Carey and Heasley proceeded to a conference room and soon began the pre-test interview portion of the examination.  Heasley notified Carey that he had taken numerous polygraphs during his life in connection with federal clearances.  (J.E. 81, Carey-Heasley Tr.

---

[34] The 'Diamond Jim' tournament is administered by the Maryland Department of Natural Resources.  (May 24 a.m. Tr. 61:25-62:2.)  This tournament also uses polygraph examinations as a verification procedure.

38:16-21.)   As the test proceeded, Heasley repeatedly stated that he understood and was comfortable with the questions which Carey was to ask him during the test itself.   (*Id.* at 25:21-26:9.)   The video evidence confirms Heasley's comprehension.   (J.E. 1.)   Carey used the directed lie comparison question technique, a test format which has been shown to have high accuracy.   The three relevant questions which Carey asked Heasley were:

1. "Did you commit any tournament violations on Tuesday?"
2. "Did you commit any tournament violations on your vessel?"
3. "Did you commit any tournament violations?"

(*Id.* at 43:21-44:18.)   Heasley responded "no" to each relevant question.   Carey asked these and the comparison questions four times.   At the end of the examination, Heasley told Carey, "I thought you were very nice" in administering the test.   (*Id.* at 54:20.)   During and after the examination, Carey noted that Heasley had moved around, creating 'artifacts' on the polygraph charts.   Interpreting the charts conservatively, Carey therefore concluded that Heasley's test was 'Inconclusive'.[35]   (J.E. 29.)

That day, Carey went on to perform polygraph examinations of Kosztyu, Hutchison, and Conway.   (May 24 a.m. Tr. 99:18-25.)   These three prize-winning anglers passed the polygraph examinations without incident.   (*Id.*)   Carey then reported the results of the four polygraph examinations to Madelyn Rowan.   (*Id.* at 68:17-69:3.)   Based on Heasley's

---

[35] This Court notes the expert testimony of Donald Krapohl, a highly experienced polygraphist with impeccable credentials, who independently assessed Heasley's polygraph charts during the course of this litigation.   Having conducted over 8,000 polygraph examinations and over 3,000 quality control reviews during the course of his career, including, notably, at the Central Intelligence Agency ("CIA"), Mr. Krapohl determined that the 'artifacts' which Carey had identified did not preclude Krapohl from properly scoring Heasley's charts.   Krapohl determined on his own review that Heasley's examination indicated 'Deception'. While Krapohl disagreed with Carey's interpretation of the results, he opined that Carey committed no professional error in his conservative reading of the charts.   (May 22 p.m. Tr. 99:5-19.)   Regardless, the record reflects that WMO did not summarily disqualify Heasley based on Carey's reading of 'Inconclusive'; rather, WMO treated the initial polygraph examination as a 'nullity' and afforded Heasley the opportunity to undergo a second examination at WMO's expense.   (May 23 p.m. Tr. 51:11-16.)

inconclusive polygraph result, WMO did not immediately disqualify Heasley and the *Kallianassa*.   Instead, WMO prudently decided to invoke Rule G.7a, and asked Captain Morris to undergo a polygraph examination that afternoon.  (May 23 p.m. Tr. 9:19-10:14.)

Morris reported to the Clarion around 2:00 p.m. on Saturday, August 13.  During the pre-test interview, Morris told Carey that he had undergone several prior polygraph examinations, including in the context of fishing tournaments, and that he had consumed a significant amount of alcohol the previous night.  (J.E. 81, Carey-Morris Tr. 31:6-33:6; 37:5-38:21.)  Carey again used the directed lie comparison question technique.  Carey asked Morris the same three relevant questions which he had asked Heasley.[36]  (*Id.* at 50:14-51-11.)  Morris responded "no" to each relevant question.  Carey asked these and the comparison questions three times.   During the examination, Morris stated that he was feeling claustrophobic; this caused Carey to pause the test.  (*Id.* at 44:11-19.)  Morris's polygraph charts, measuring his cardiovascular, pulmonary, and perspiratory systems, did not show any significant reaction; as expert witness Donald Krapohl later testified, these scientific data undermine Morris' subsequent suggestions that he was having a 'panic attack'.  Following the examination, Carey concluded that Morris had been 'Deceptive' in his responses.  (J.E. 30.)

After the test, Carey told Morris that he was "reacting to the tournament violation question" and did not pass the polygraph examination.  (Carey-Morris Tr. 66:4-10.)  Morris immediately became upset and reacted with expletives and incredulity.  (*Id.* at 66:11-70:9.)  In particular, Morris was disturbed at the prospect of not winning the "life changing amount of

---

[36] Those questions were:
1.  "Did you commit any tournament violations on Tuesday?"
2.  "Did you commit any tournament violations on your vessel?"
3.  "Did you commit any tournament violations?"

money." (*Id.* at 70:9.)  In an effort to calm Morris and to make him aware of his rights under the Tournament Rules, Carey read to Morris the portions of Rule G.7 which allow him to dispute an unfavorable polygraph result.  (*Id.* at 72:16-73:5; J.E. 25.)  Carey affirmatively encouraged Morris to "get a second opinion." (*Id.* at 73:2-3.)  Carey then called Madelyn Rowan to notify her of Morris' deceptive polygraph result.

WMO Directors Jim Motsko, Andy Motsko, and Madelyn Rowan soon reported to the conference room where Carey had performed the examinations.  Morris was excused from the room.  Carey proceeded to explain Heasley and Morris's results to the WMO Directors.  (J.E. 81, Carey-Morris Tr. 86:6-116:2.)  Based on Carey's explanation that Heasley's result was inconclusive and Morris's result deceptive, WMO determined that it would withhold the prize money and accord Heasley and Mates Bohannon and Hagen the opportunity to undergo polygraph examinations.  (May 23 p.m. Tr. 13:11-14:1.)  This Court finds that throughout this conversation, the WMO Directors acted in good faith and accorded Heasley and his crew the benefit of the doubt, but prudently and reasonably determined that it would be inappropriate to distribute the prize money before Heasley had satisfied his obligation under the Tournament Rules.

The WMO Directors then notified Heasley and his crew that while they would receive the first place trophy and promotional check at the Awards Ceremony, WMO would withhold the prize money pending the results of additional polygraph examinations.  (May 23 p.m. Tr. 14:8-15:18.)  Heasley agreed to this proposal, and went on to receive the trophy at the Tournament's Awards Ceremony.  (*Id.*)  It was also agreed that Madelyn Rowan would look into scheduling the subsequent polygraph examinations.  (*Id.*)

The August 21 Polygraphs (Heasley, Bohannon, and Hagen)

As agreed on August 13, Madelyn Rowan began to arrange for Heasley, Bohannon, and Hagen to take subsequent polygraph examinations at WMO's expense.   On the afternoon of Sunday, August 14, Carey sent an email to Rowan notifying her of certain quality control steps he had taken and warning her that people can try to buy a particular result on a polygraph test.   (J.E. 35.)   Rowan asked Carey for some recommendations of other polygraphists; among Carey's recommendations was David Saneman, whom Carey had met through the Maryland Polygraph Association.   Ultimately, Rowan decided that Heasley and his mates would undergo the polygraphs in Maryland with David Saneman.   (May 23 p.m. Tr. 17:19-18:11.)   Heasley, who had already planned to return to Ocean City the following week to fish in the Mid-Atlantic Tournament, agreed to undergo a second polygraph examination in Maryland on August 21.   (*Id.*)   This Court finds that Rowan and WMO acted prudently and reasonably in requesting that Heasley and his mates undergo additional polygraphs, to be administered at WMO's expense, in Maryland.

Heasley, Bohannon, and Hagen reported to the office of Paul Carey in Salisbury, Maryland on the morning of Saturday, August 21, 2016.[37]   There, they met polygraph examiner David Saneman.   Saneman worked for thirty-two years at the Harford County Sheriff's Office, and has a Bachelor's Degree in Criminal Justice from the University of Baltimore.   (May 24 p.m. Tr. 15:2-18:5.)   In 1987, he attended the Cleve Backster Polygraph School in San Diego, California, a school accredited by the APA.   (*Id.*)   Saneman is a Vice President of the Maryland Polygraph Association and a member of the APA.   (*Id.*)   He has

---

[37] There is no indication that Carey was present for the examination or that Carey interacted with the examinees at all.   Carey merely allowed Saneman to use his office space for the exams.

performed over 2,500 polygraph examinations in his career. (*Id.*) This Court finds that Saneman is a qualified polygraph examiner, and it was reasonable for WMO to hire him.

Saneman administered separate polygraph examinations on Heasley, Bohannon, and Hagen. Saneman used the probable lie comparison question technique, a test format which has been shown to have high accuracy. (May 24 p.m. Tr. 42:11-16.) The relevant questions which Saneman asked all three examinees were variations of the question: "Did you, yourself, violate any fishing rules on Tuesday, August 9, 2016?" *See, e.g.,* J.E. 81, Saneman-Heasley Tr. 69:21-70:2. All three examinees responded "no" to the relevant questions every time they were asked. Saneman determined that all three men's examinations using the probable lie comparison question technique indicated 'Deception'. (J.E. 31, 32, 33.)

During each examination, Saneman also performed a relevant/irrelevant question test. (May 23 p.m. Tr. 42:17-19.) This technique has been shown to have much lower accuracy than the comparison question technique. (May 23 a.m. Tr. 22:13-23:8.) However, this test format is still commonly taught in APA-accredited polygraph schools. (*Id.*) It appears that Saneman used this technique in order to ask violation-specific questions posed by Madelyn Rowan in her pre-test instructions to Saneman. *Compare* J.E. 37 with J.E. 81, Saneman-Heasley Tr. 79:14-80:8. Saneman determined that all three men's examinations using the relevant/irrelevant question test indicated 'Deception'. (J.E. 31, 32, 33.)

Saneman promptly notified Madelyn Rowan of the results of the polygraph examinations of Heasley, Bohannon, and Hagen.

WMO's Determination to Not Award Heasley the Prize Money

On August 22, 2016, WMO officials consulted with their counsel, Joseph Moore, Esq., and with the Tournament's independent judges.  (May 22 a.m. Tr. 92:15-19.)   As neither Heasley nor his shipmates had passed a polygraph examination, WMO determined that it would not award Heasley the first place prize money.  (*Id.*)

That evening, WMO called Heasley to notify him of its determination.  (May 22 a.m. Tr. 92:20-93:22.)  WMO also requested that Heasley execute a release of the funds so that those funds could be distributed to the other winning anglers.  (May 30 a.m. Tr. 63:16-64:11.)  Heasley asserted that neither he nor any member of the *Kallianassa* had violated any Tournament Rules, declined to execute the release, and provided WMO with the name of his attorney, Christopher Sullivan, Esq., for any further communication.  (*Id.*)

On August 23, 2016, Mr. Moore, on behalf of WMO, spoke with Mr. Sullivan, on behalf of Heasley, by telephone.  (J.E. 39.)  Following that conversation, Moore sent Sullivan a letter stating WMO's intention to file an Interpleader action in the Circuit Court of Maryland for Worcester County.  (*Id.*)

On the morning of August 26, 2016, Mr. Moore sent to Mr. Sullivan by email a copy of the Interpleader Complaint (ECF No. 2) which Moore stated would be filed that same day.  (J.E. 40., WMO 000045)  Later that morning, Sullivan stated in response: "My client wishes to avail himself of all the rights he has under the tournament rules.  I objection [*sic*] to the filing of the interpleader until my client can avail himself of all his rights under the contest rules."  (*Id.*)  Moore soon responded to Sullivan's message as follows:

> "**[Y]our client can certainly avail himself of the rules**, and the results of those matters will be forwarded to the court.  However, we are filing the

*interpleader* since your client (as is his right) has been openly and publically [*sic*] stating that he will be vindicated…

…

We have the right to have the matter determined by a court which takes the decision making out of any possible allegation of bias, or unfairness."

(*Id.*, WMO 000044) (emphasis added.)  WMO filed its Complaint that afternoon.

The August 29 Polygraphs in Baltimore (Heasley, Morris, Bohannon, Hagen)

Rule G.7d of the WMO Tournament Rules provides:

"**If an angler wishes to dispute an unfavorable polygraph result, the angler may have a second polygraph conducted within 10 days** by a qualified polygraph examiner at the angler's expense.  This polygraph must be administered to ASTM standards.   The decision as to which of the two polygraph tests will be used to determine prize money eligibility is that of the tournament directors in cooperation with the polygraph examiner(s)."

(J.E. 25, WMO 000004) (emphasis added.)

On August 29, 2016, Mates Bohannon and Hagen underwent polygraph examinations administered by Jack Trimarco in Baltimore, Maryland.[38]  (Pl.'s Ex. 15; May 24 a.m. Tr. 29:18-22.)  On August 30, Heasley and Morris underwent polygraph examinations, also administered by Trimarco in Baltimore.  The results of these polygraph examinations were never disclosed to WMO and have not been produced during the course of this litigation.  *See supra* at 7-8.  Notwithstanding, the fact that Heasley and his crew underwent their own polygraph examinations fewer than ten days after WMO notified Heasley that he would not be awarded the prize money clearly negates Heasley's claim that WMO foreclosed on his rights under the Tournament Rules.

---

[38] This Court takes judicial notice of the fact that the American Polygraph Association's 51st Annual Seminar/Workshop was held at the Hilton Baltimore Hotel from August 28 to September 2, 2016.  *See* http://www.polygraph.org/assets/docs/Misc.Docs/2016%20seminar%20program%208-8-16.pdf   [accessed June 9, 2016].   Among the speakers at this conference were Donald Krapohl, Mark Handler, and Jack Trimarco.  This fact is purely coincidental to the instant case, though examiner Saneman stated that he attended the workshop.  (May 24 p.m. Tr. 17:22-18:5.)

Expert Testimony Regarding the WMO Polygraph Examinations

At trial, the parties presented competing expert testimony regarding the propriety of the polygraph examinations administered by Carey and Saneman for WMO.  Plaintiffs relied on the expert testimony of Donald Krapohl[39] and David Raskin[40].  Heasley relied on the expert testimony of Mark Handler[41].  This Court finds Mr. Krapohl to be highly credible, and, in light of his extensive experience, training, and education in the field of polygraphy, attributes substantial weight to the opinions he rendered.  This Court finds Dr. Raskin's opinions to be credible, though his academic quibbles with certain industry standards somewhat weakens the weight attributed to his testimony.  This Court finds much less credible the opinions rendered by Mr. Handler based on his very limited experience

[39] Donald Krapohl is one of the leading polygraph authorities in the country.  He served as Deputy Director of the National Center for Credibility Assessment ("NCCA"), the highly respected polygraph school which provides training to polygraphists throughout the federal government.   (Krapohl CV, Pl.'s Ex. 2.)  Prior to his time at NCCA, Mr. Krapohl had a long career as a polygraph examiner for the Central Intelligence Agency ("CIA"), where he conducted thousands of polygraphs and reviewed thousands more.  He has a Master's Degree from Catholic University in Washington, D.C., and attended an APA accredited polygraph school, as well as the FBI's Advanced Polygraph Course at the University of Virginia. He is a member of the APA and has served as an editor of the APA's peer-reviewed journal, *Polygraph*. He served on the ASTM's Committee on Forensic Psychophysiology, and had a hand in crafting the ASTM standards for polygraphy. He has authored numerous research articles, as well as a textbook on polygraphy.  His work is widely cited throughout the polygraph profession.  No *voir dire* of Mr. Krapohl was conducted.

[40] Dr. David Raskin is a pioneer in the field of polygraphy.  For over forty years, Raskin and his colleagues at the University of Utah conducted the research to validate the Comparison Question Technique, which was used in this case. (Raskin CV, Pl.'s Ex. 4.)  He has conducted numerous research studies and has authored numerous articles on the validity of polygraph, and his work is widely cited throughout the polygraph field. No *voir dire* was conducted, though defendant introduced into evidence two federal criminal cases in which the opinions rendered by Dr. Raskin were not credited.

[41] Mark Handler is a polygraph examiner who also works as a credibility assessment instructor for the company Converus.  (Handler CV, Def.'s Ex. 195.)  He attended an APA-accredited polygraph school in Georgia in 2003, is a member of the APA, has written numerous published articles in the field of polygraphy, and has served on the editorial board of the APA's journal, *Polygraph*.  During *voir dire*, Handler testified that his highest educational attainment is a two-year Associate's degree; he is not a college graduate.  He also stated that he performed approximately twelve polygraphs per year over the past five years.  He has no formal training in polygraph quality control reviews and has performed very few such reviews.

conducting quality control reviews of polygraph examinations and the inconsistencies in his testimony which emerged on cross-examination.[42]

In light of the foregoing, this Court credits Mr. Krapohl's opinions that Carey and Saneman's polygraph examinations of Heasley, Morris, Bohannon, and Hagen were performed within the standard of care for polygraph examiners and in accordance with ASTM standards.  (May 22 p.m. Tr. 95:22-96:10; May 23 a.m. Tr. 9:6-14; 17:8-23; 28:8-29:9.)

In addition, based on the common testimony of Krapohl and Handler, this Court finds that the Carey and Saneman examinations were screening tests conducted using diagnostic techniques.   (May 22 p.m. Tr. 86:2-87:16.)   The use of this approach was appropriate given the circumstances of the fishing tournament.   That is, screening tests typically are administered in the absence of a known allegation, whereas diagnostic tests are given where there exists a specific allegation of wrongdoing.   (*Id.*)  In the WMO and other big-money fishing tournaments, polygraphs are administered to top prize winners even where there are no allegations of wrongdoing, making the screening approach appropriate. (May 24 a.m. Tr. 42:19-43:14.)   At the same time, the focus of the inquiry in fishing tournaments is sufficiently limited in time and scope such that diagnostic techniques properly may be employed.  (may 22 p.m. Tr. 88:23-89:5.)  Thus, the relevant questions used by Carey ("Did you commit any tournament violations on Tuesday?") and Saneman ("Did you, yourself, violate any fishing rules on Tuesday, August 9, 2016?") were appropriate insofar as they did not assume wrongdoing on the part of the examinee, included any type of rule violation, and were focused narrowly on the time of the angler's prize-winning catch.

---

[42] This Court notes that Handler did <u>not</u> opine that Heasley's results were other than deceptive.  Handler only proposed that the Carey and Saneman exams should be rejected.  (May 31 p.m. Tr. 2:21-3:2.)

Finally, based on its own review of the videos and transcripts of the polygraph examinations, as well as the opinion of Mr. Krapohl, this Court finds that Heasley, Morris, Bohannon, and Hagen were of sufficiently sound mind to undergo the examinations and fully understood the questions which the examiners posed to them.  (J.E. 1, 3, 5, 9, 13.)

In sum, while Heasley has asserted a lengthy litany[43] of alleged flaws in the Carey and Saneman polygraph examinations in order to distract from the obvious fact of his deceptive test results, this Court finds these *post hac* rationalizations to be petty and without merit.  The Carey and Saneman polygraphs were administered properly.

Expert Testimony Regarding Polygraph Reliability

This Court also heard testimony from plaintiffs' expert, Dr. Louis Rovner, and defendant's expert, Dr. William Iacono.  Dr. Rovner did not review the Carey or Saneman polygraph examinations.   (May 25 a.m. Tr. 8:18-20.)   While Dr. Iacono reviewed these polygraphs, he stated on *voir dire* that he was not trained to administer and has never administered a polygraph examination for diagnostic purposes.  (June 2 a.m. Tr. 68:4-9.) Moreover, he was not qualified to offer expert opinions on the propriety of the Carey and Saneman polygraphs.  (*Id.* at 91:9-92:1.)   Instead, their testimony related to the scientific reliability of polygraph evidence.  Dr. Rovner testified that polygraph examinations using the comparison question technique are ninety percent (90%) accurate.  (May 25 a.m. Tr. 11:20-25.)   In contrast, Dr. Iacono opined that polygraph evidence is inherently unreliable and,

---

[43] Heasley has argued, *inter alia*, that: the relevant questions were overly broad; the examiners did not explain sufficiently the polygraph results to WMO; the examiners should have used the "successive hurdles" approach to uncover the specific rule violated; the examiners did not obtain an adequate number of test charts; the examiners should have conducted post-test interviews; the examiners improperly emphasized certain questions; Carey improperly influenced WMO; Carey improperly influenced Saneman; Saneman's secondary relevant/irrelevant test is scientifically invalid; Saneman was unfamiliar with ASTM standards and, thus, could not have complied with them.  (Def.'s Proposed Findings, ECF No. 147 at 8-16.)

thus, should not be accorded any weight in these proceedings. (June 2 p.m. Tr. 2:21-25; 31:7-8.)

This Court permitted this evidence to be presented notwithstanding the fact that the WMO Tournament Rules expressly provide for the use of polygraph evidence in determining participants' eligibility for Tournament prize money. (J.E. 25 at G.7.) It is well established under Maryland law that freely contracting parties may agree to the use of polygraph examinations. *Allgood v. State*, 309 Md. 58, 72, 522 A.2d 917, 923 (1987). *See also United States v. White*, 532 F. App'x 390, 391 (4th Cir. 2013). While this Court denied plaintiffs' Motion *in limine* to exclude Dr. Iacono's testimony (ECF No. 103), this decision was based on the possibility that Heasley would be able to demonstrate that the WMO-administered polygraphs were defective such that Heasley's duty to take and pass a polygraph examination would be excused. Only in that circumstance would this Court need to consider Dr. Iacono's opinions regarding the weight to be attributed to the polygraph evidence. As set forth above, the WMO's polygraphs were properly administered, and Heasley's performance under the WMO Tournament Rules was not excused. Thus, Dr. Rover and Dr. Iacono's opinions regarding the reliability of polygraph evidence are of limited relevance and value to this Court.

## CONCLUSIONS OF LAW

**I.   WMO Complied With Its Obligations Under the Tournament Rules; Heasley's Performance Under the Contract Was Not Excused as a Matter of Law; Heasley Failed to Satisfy the Tournament Rules' Polygraph Requirement; Heasley is Not Entitled to the Prize Money**

It is well established under Maryland law that freely contracting parties may agree to the use of polygraph examinations. *Allgood v. State*, 309 Md. 58, 72, 522 A.2d 917, 923 (1987). *See also United States v. White*, 532 F. App'x 390, 391 (4th Cir. 2013). Polygraph examinations are, moreover, commonly used in fishing tournaments throughout the country. *See, e.g., Dudley v. Bass Anglers Sportsman Soc.*, 777 So. 2d 135, 136 (Ala. Civ. App. 2000); *Century Bass Club v. Millender*, 949 S.W.2d 841, 847 (Tex. App. 1997); *Schmidt v. Three Lakes Chamber of Commerce*, 142 Wis. 2d 936, 417 N.W.2d 196 (Wis. Ct. App. 1987).

"[U]nder Maryland law, a party suing on the contract must first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party." *Publish Am., LLP v. Stern*, 216 Md. App. 82, 102, 84 A.3d 237, 249 (2014) (quoting *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 260–61 (4th Cir. 1981)). *See also Collins/Snoops Assocs., Inc. v. CJF, LLC*, 190 Md. App. 146, 161, 988 A.2d 49, 58 (2010) (same). "It is fundamental that where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused." *Laurel Race Course, Inc. v. Regal Const. Co., Inc.*, 274 Md. 142, 154, 333 A.2d 319, 327 (1975)). "A material breach by one party to a contract excuses the other party from performance." *Whiting-Turner Contracting Co. v. Capstone Dev. Corp.*, WDQ-12-3730, 2013 WL 5423953, at *8 (D. Md. Sept. 26, 2013). "A breach is material 'if it affects the purpose of the contract in an important or

vital way.' Whether a breach of contract is material is normally a question of fact, unless 'the

issue is so clear that it may be decided as a matter of law.'" *Id.* (quoting *Barufaldi v. Ocean*

*City, Chamber of Commerce, Inc.,* 196 Md. App. 1, 23, 7 A.3d 643, 656–57 (Md. Ct. Spec. App.

2010)).

In the instant case, WMO Tournament Rule G.7 provides that "[a]ll anglers winning

$50,000 or more…may be required, at the discretion of the White Marlin Open, to take and

pass, at the determination of the test administrator, a polygraph test prior to the distribution

of any awards." (J.E. 25 at G.7.)  In addition, the rule expressly states that WMO "may, at

its discretion, also request that a polygraph test be taken by any other angler or crew member

registered to that boat." (*Id.* at G.7a.)  This rule creates a condition precedent to WMO's

obligation to award the top prizes under the contract.

Heasley's reported catch of the 76.5 pound white marlin on August 9, 2016 made him

eligible for over $2.8 million in Prize Money and, thus, subject to Rule G.7.  (J.E. 72.)  WMO

notified Heasley on the evening of Friday, August 12, 2016 that it was exercising its right

under Rule G.7 to require him to take and pass a polygraph prior to distribution of the prize

money.

Heasley underwent a polygraph examination on August 13, 2016.  The results of this

examination were deemed inconclusive by examiner Carey.  Thus, Heasley did not satisfy the

contractual condition precedent, which required him to pass the examination "at the

determination of the test administrator." (J.E. 25 at G.7.)  WMO then permitted Morris to

undergo a polygraph examination that afternoon in order to satisfy the condition precedent

on behalf of Heasley and the *Kallianassa*.  Morris did not pass the polygraph test on August

13.   Rather than disqualify Heasley at that time, WMO and Heasley agreed that Heasley, Bohannon, and Hagen would undergo additional polygraphs in order to attempt to satisfy the condition.   WMO later directed them to undergo polygraphs administered by examiner Saneman on August 21, 2016.   None of the three men passed their August 21, 2016 polygraph tests.   Thus, as of August 22, 2016, when WMO notified Heasley that it would not award him the prize money, Heasley had failed to perform under the Tournament Rules contract as a matter of law.

During this litigation, Heasley has argued that his failure to perform under the contract should be excused on account of WMO's own failure to administer the polygraph examinations properly.   As set forth in detail above, however, Heasley's arguments regarding the alleged deficiencies of the Carey and Saneman polygraphs are without merit.   Based on this Court's Findings of Fact, this Court concludes as a matter of law that WMO satisfied its contractual duty to administer the polygraph examinations reasonably and in accordance with ASTM standards.[44]

In sum, WMO performed under the Tournament Rules contract.   Heasley failed to satisfy the condition precedent that he take and pass a polygraph examination.   Heasley's performance was not excused.   Heasley is not entitled to the $2,818,662.00 in Prize Money as a matter of law.

---

[44] While the Tournament Rules do not require the WMO-administered polygraphs to adhere to ASTM standards, this Court, based on the expert testimony of Donald Krapohl, found that the Carey and Saneman polygraphs did so comply.   Consequently, this Court need not reach Heasley's *noscitur a sociis* argument based on the distinctions between rule G.7 and G.7d.   *See* ECF No. 147 at 21.

**II.     Even if WMO Had Breached Its Obligations Under the Tournament
Rules, Heasley Would Not Be Entitled to the Prize Money Because the
Evidence Shows that Heasley and the Crew of the *Kallianassa* Violated the
Tournament Rules by Deploying Fishing Lines Before 8:30 a.m. on
Tuesday, August 9, 2016, the Date They Caught the 76.5 Pound White
Marlin**

It was previously agreed by the parties that, in the event that Heasley was able to

show that WMO breached the Contract, this Court "then would make factual

determinations as to who is entitled to the Tournament prize money" based on the

underlying Interpleader action.  (ECF No. 105 at 5, n. 4.)  As set forth above, this Court

concludes as a matter of law that WMO did not breach its contractual obligations and that

Heasley is not entitled to the prize money as a matter of law.  However, for the reasons

stated in detail above, this Court further finds that even if WMO had breached its

obligations under the Tournament Rules—which it did not—Heasley would not be entitled

to the prize money because the evidence shows that Heasley and the crew of the *Kallianassa*

violated the Tournament Rules by deploying fishing lines before 8:30 a.m. on Tuesday,

August 9, 2016, the date they caught the 76.5 pound white marlin.

**III.    WMO Did Not Abandon The Prize Money Payout Procedure; WMO Did
Not Breach the Tournament Rules Contract; WMO Is Entitled to
Judgment on Heasley's First Counterclaim**

In his answer to WMO's Amended Complaint, Heasley alleged two counterclaims

against WMO.  First, Heasley alleged that WMO breached the Tournament Rules Contract

by foreclosing on Heasley's right to avail himself of Rule G.7d, which allows an angler to

dispute an unfavorable polygraph result.  (ECF No. 95 at ¶¶ 75-82.)  WMO denies Heasley's

allegations.  (ECF No. 98 at ¶¶ 75-82.)

Rule G.7d states:

> "If an angler wishes to dispute an unfavorable polygraph result, the angler may have a second polygraph conducted with in [*sic*] 10 days by a qualified polygraph examiner at the angler's expense.   This polygraph must be administered to ASTM standards.   The decision as to which of the two polygraph tests will be used to determine prize money eligibility is that of the tournament directors in cooperation with the polygraph examiner(s)."

(J.E. 25 at G.7d.)  Heasley alleges that by filing this interpleader action on August 26, 2016, before the ten day dispute period expired, WMO "breached the Tournament Rules by refusing to make a determination on Heasley's eligibility for the prize money…"  (ECF No. 95 at ¶ 81.)

"[U]nder Maryland law, a party suing on the contract must first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party."  *Stern*, 216 Md. App. at 102, 84 A.3d at 249.

At trial, WMO presented evidence that Heasley and the crew of the *Kallianassa* in fact underwent polygraphs administered by Jack Trimarco on August 29 and August 30, 2016— **after the interpleader action was filed** and within ten days of WMO's notifying Heasley of his unfavorable polygraph results from the Saneman examination.[45]  (Pl.'s Ex. 15; May 24 a.m. Tr. 29:18-22.)  Thus, Heasley is unable to prove as a matter of law that WMO prevented him from exercising his right to dispute the unfavorable polygraph examinations.  To the contrary, Heasley expressly declined to avail himself of that right by choosing not to present the results of the Trimarco-administered polygraphs to WMO within the applicable ten day

---

[45] As noted above, WMO treated Heasley's inconclusive results (on the Carey exam) as a nullity and afforded Heasley the opportunity to undergo a second examination at WMO's expense.

period.[46]  Nor, it should be noted, has Heasley produced the results of these polygraphs during this litigation.  In addition, even before the suit was filed, WMO's counsel made clear its position that Heasley could avail himself of the rules.  (J.E. 40, WMO 000044.)  Finally, the fact that WMO availed itself of its right to have a court adjudicate the dispute in no way impeded Mr. Heasley from pursuing his rights under the Tournament Rules.  The mere act of filing a lawsuit generally—and certainly in this case—does not alter the underlying contractual relationship between the parties.

Thus, WMO did not, as a matter of law, foreclose Heasley's rights under Rule G.7d and did not abandon its Prize Money payout procedure.  As WMO did not breach the contract, it is entitled to judgment in its favor on Heasley's first Counterclaim.[47]

## IV.    Maryland Courts Do Not Recognize an Independent Cause of Action For Breach of the Contractual Duty of Good Faith and Fair Dealing; WMO Is Entitled to Judgment on Heasley's Second Counterclaim

Heasley also raised a second Counterclaim alleging that WMO breached its implied duty of good faith and fair dealing under the Tournament Rules contract by, *inter alia*, "administering and relying upon substandard [polygraph] examinations," "filing an interpleader action and surrendering its rights to decide the controversy," and "refusing to investigate whether polygraph examiners Carey and Saneman conducted the polygraph examinations to ASTM standards."   (ECF No. 95 at ¶¶ 83-90.)   This purported Counterclaim merely repeats the allegations levied in the breach of contract counterclaim.

---

[46] As explained above, Heasley even moved for a Protective Order *to avoid* having to disclose the existence of the Trimarco polygraphs.  (ECF No. 80.)

[47] To the extent that Heasley's first Counterclaim alleges that WMO breached the contract "by relying upon substandard polygraph examinations by Carey and Saneman," WMO is also entitled to judgment for the reasons previously stated herein.  *See supra,* Conclusions of Law I.

It is to avoid precisely these types of redundant claims that Maryland courts do not recognize "an independent cause of action for breach of the implied contractual duty of good faith and fair dealing." *Mount Vernon Properties, LLC v. Branch Banking And Trust Co.*, 170 Md. App. 457, 472, 907 A.2d 373, 381 (2006) (quoting *Baker v. Sun Co.,* 985 F. Supp. 609, 610 (D. Md. 1997)).[48]  *See also* Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland*, § 2.1 at 29 (3d ed. 2004) ("Maryland does not recognize, however, an independent cause of action for breach of the implied contractual duty of good faith and fair dealing.").  "A breach of the implied duty of good faith and fair dealing is better viewed as an element of another cause of action at law, *e.g.,* breach of contract, than as a stand-alone cause of action for money damages, and we conclude that no independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing." *Mount Vernon Properties*, 170 Md. App. at 472, 907 A.2d at 381.

Thus, WMO is entitled to judgment as a matter of law on Heasley's second Counterclaim.[49]

---

[48] Heasley's reliance on *Parker v. The Columbia Bank,* 91 Md.App. 346, 366, 604 A.2d 521, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992), in his Proposed Conclusions of Law is expressly recognized by the Court of Special Appeals in *Mount Vernon* as an incomplete statement of applicable Maryland law.  *See* ECF No. 147 at ¶ 19.

[49] Heasley's passing reference in his proposed Conclusions of Law to a purported breach of fiduciary duty by WMO is both irrelevant and inapt.  (ECF No. 147 at ¶¶ 22-32.)  First, Heasley did not plead a claim for breach of fiduciary duty in his Answer and Counterclaims.  (ECF No. 95.)  Second, Heasley presented no evidence at trial of this alleged breach.  And third, this Court's factual findings compel the legal conclusion that WMO acted at all times prudently and responsibly, including in its decision to file the Interpleader to avoid possibly competing claims and liabilities.

# CONCLUSION

For the foregoing reasons, this Court concludes that:

1. Plaintiff White Marlin Open, Inc. complied with its obligations under the 2016 White Marlin Open Tournament Rules and did not breach that contract;

2. Defendant Philip G. Heasley's performance under the Tournament Rules contract was not excused;

3. Heasley failed to satisfy the Tournament Rules' polygraph requirement and, therefore, failed to perform under that contract;

4. Heasley is not entitled to the $2,818,662.00 in Prize Money as a matter of law;

5. Even if plaintiff White Marlin Open, Inc. had breached its obligations under the 2016 Tournament Rules, Heasley would not be entitled to the prize money because the evidence presented at trial shows that Heasley and the crew of the *Kallianassa* violated the Tournament Rules by deploying fishing lines before 8:30 a.m. on Tuesday, August 9, 2016, the date they caught the 76.5 pound white marlin;

6. Judgment shall be ENTERED in favor of WMO on Heasley's Counterclaims (ECF No. 95);

7. Counsel for the respective plaintiffs SHALL CONFER regarding matters which remain for this Court's determination and SHALL SUBMIT a joint Status Report no later than **Friday, June 23, 2017**.

A separate Order follows.


Dated: June 14, 2017                              _____/s/_____
                                                  Richard D. Bennett
                                                  United States District Judge

**EXHIBIT A**

Defendant's Exhibit # 194

Fishing "Spread" of Fishing Lines, Baits, Teasers, Lures, and Dredges
on the *Kallianassa* during the 2016 White Marlin Open

**EXHIBIT A**



Kallianassa – Naples, FL